at all. Oral argument not to exceed. 15 minutes per side. And when ready, Mr. Miller for the May it please the court. My name is Andrew Miller and I represent the defendants appellants cross appellees in this matter. At this time, I'd like to reserve 5 minutes for rebuttal. It's it's interesting that the council in the previous argument brought up the issue of the court's recent decision Mondays. The Supreme Court's this Monday decision in Westby because I discovered that case in preparing for this argument as well. Admittedly, it is a 4th Amendment case related to arrest and not an excessive force case such as this one. But it does highlight a point that was also reaffirmed by this court on December 27th, 2017, and a case called Lattice L.A. T. I. T. S. And I apologize for not having a specific case number. I do have the date December 27th, 2007, and it was offered by Judge Strange. Both of those cases start with the issue of are basically irrelevant to this case for the issue of qualified immunity, which permeates pretty much most of the cases that are the one issue. The the the use of force issue with respect to Officer McKee's third use of force in this case, it actually affects all the uses of force, but and the denial of medical care claim. But I wanted to stress the the notion that in order to establish that it's the plaintiff's burden to establish a clearly to show that a right was clearly established on the date that the alleged right was deprived and that in order to do that. The court, the plaintiff needs to provide this court with either a case on point or a robust presidential authority that puts the question beyond doubt. And at this point, the plaintiffs has failed to carry that burden in this court and the court below. For any of the for any for any, Your Honor, because the way they've the way plaintiff has framed this case, the clearly established rights is basically a reiteration of the Garner standard, which the Supreme Court has specifically said is too broad in general. So for showing that there is that it is still uncertain whether you can shoot someone who is incapacitated on the ground and you stand at a distance from them. I don't have a case that says that it's OK or reasonable, but I would argue the record doesn't establish that Mr. White was incapacitated on the ground. Mr. White was and we're jumping to McKee's officer McKee's third use of force, which immediately preceded his second use of force. So the two really need to be discussed in close proximity to one another. After McKee's second use of force, which were two double tap rounds, officer Jason White fell to the ground and immediately began getting back up, still with the knife, still training, still I still trained on officer McKee. Officer McKee within a second fired two more shots and normally under the segmented analysis, we have to break those up and treat them as two separate incidents altogether. But if we look at the rush decision decided by this court in 2016, when two uses of force follow that closely, one from the other, the justification for the first carries over into the second. From an academic point of view, it's an exception to the segmented analysis rule. When the result of the first, here the second use of force, let's call it the previous use of force, when the result of that previous use of force changes the situation, doesn't that require analysis? He said, my understanding was that McKee even testified that he took the two shots, he knows that he hit White, White had already been wounded, the police officers were aware of that, when he did the two shots in the second use of force, White went down. And he knew that officers were immediately behind him and they arrived almost at that moment and he was some distance away, not within any reach of a knife, not within a confined space. Don't you think that, help me understand what law would say that if he could shoot the first time and all of these consequences result, then the first shooting's privilege extends to the second, because I don't think that's the law. I would say that's exactly what RUSH stands for, because in that particular case. Let me ask a question so that I'm clear on what it is the two of you are arguing about. Are you saying under RUSH, the second use of force, the rationale for that extends to the third use, or are you saying under RUSH, the two shots in the third use, the first one and the second one are indistinguishable, and so the reason for shooting him the first time in the third use of force is the same as the second time? Which argument are you making, because I think they're distinct. Academically, I don't see the distinction between the two, because the argument for, and I'll answer both questions in a minute. The RUSH decision basically was that given the totality of the circumstances, the traditional notions of officers being required to make split-second decisions, that the first question is, do the two uses of force, do the two separate uses of force occur so close together that, and it really could, whatever the justification is, the result's the same. Whether we view it as the justification for the first use of force carrying over to the second use of force, or we treat them all as the same, the logic employed is the same. The reason we have the RUSH reach the conclusion it did is the same. It's because of the fast split-second decision-making that's going on in a deadly force situation. And then go back to explaining to Judge Stranch how it is that the second use of force and the third use of force here are really analogous to what went on in RUSH. What happened in RUSH was the first use of force was a shot to, I believe, the head of the suspect. There was a conflict in the testimony where the officer said she continued to lunge at the officer with a knife. However... This is the young woman. The young woman. In the closet case. Yes. Is that correct? Yes. And the first shot was to her midsection. Okay. And the second shot was to her head. Yes. And the location of that event is very distinct from this event. In RUSH, the young woman was in, as you know, I was on the panel. Sure. The young woman was in a closet. The officer was in the very facing door of the closet. And the majority determined that the first shot in which she then fell forward was still within the range of the weapon she held. This case doesn't partake of that analysis at all. Because here you have Mr. McKee, Officer McKee, standing away from Mr. White, shooting two shots, one of which hits him and knocks him down. They are in an open area at that point. Other officers are approaching from behind. And he is indisputably out of the range of a knife weapon. Isn't that correct? At the time Mr. White is on the ground... At the time he shot him again. At the time he was on the ground, yes. But once he gets to his feet, he's not. And the question is... And this we're sort of leaving the RUSH analysis and moving into just analyzing McKee's third set of shots on their own merit. There's no case law that says... The totality of the circumstances facing McKee during the third set of shots is based on everything that had come before. We have a suspect who has been shot and still doggedly, for reasons that a reasonable officer would suspect is harmful, intent on keeping this knife. He's getting back up. He's still staring at McKee. He's... Officer McKee... What was the estimated distance between them? 10 to 15 feet. 10 to 15 feet. Yes. Is that within the range of a blade weapon? As if... Yes or no? No. Is that within the range of a blade weapon? No. But... If McKee gets to his feet and rushes... Or if Jason White gets to his feet and rushes McKee, then yes it is. The dogged determination to maintain the knife, to get back up, gave an officer in Officer McKee's position every reasonable belief... That the attack was still ongoing. The threat was still ongoing. Again, combine that with the short time between the two, we're still talking about a split second decision. The idea that officers were coming, he's in an open field, he could have done a variety of things, is the basic definition of the hindsight analysis and second guessing... That both this court and the Sixth Circuit have admonished in the past. I see my time is winding down. If the court has no more questions, I'll wait for my rebuttal. We do not. Thank you. Good morning. As the cross appellant, I'd like to reserve three minutes for rebuttal. Good morning, your honors. Nick DiCello on behalf of the family of Jason White and the estate of Jason White. As recently as 2016, this court repeated in Withers v. City of Cleveland, quote, qualified immunity in cases involving claims of excessive force is difficult to determine on summary judgment... Because a police officer's liability turns upon the Fourth Amendment's reasonableness test... And it cited cases that I'd indicate, quote, reasonableness under the Fourth Amendment should frequently remain a question for the jury. This was not an active shooter situation where these 20 or 30 officers were responding with shoot to kill. This was a young man with a kitchen knife. So you let him go? You don't let him go, your honor. There's 20 to 30 officers surrounding this. They have the area and perimeter secure. Once he's on the ground, they converge on him within seconds. They can't stop him if he doesn't want to be stopped, I think is what you're saying. You can surround him, but you can't touch him. Judge, the law for individuals with knives and individuals who are fleeing on foot is clearly established, has long been clearly established in this circuit, and it states that until and unless that individual with a knife, not a gun, this is very different than a gun case, Judge, I would submit, until and unless that individual with a knife poses an imminent, immediate threat of death or serious physical injury, the Constitution protects that individual from the use of deadly force. A reasonable officer in the position of Officer McKee, who knew that the guy, keeping in mind that since we can't use hindsight, we don't know the mental condition of this guy. So a reasonable officer in McKee's position, knowing that this guy has a knife, has, everyone thinks, tried to break into an apartment, in fact, perhaps has broken into an apartment with a knife, and now has been doing whatever it took to escape being captured and refused repeatedly to put down the knife, and has been shot and still is going and refusing to put down the knife. A reasonable officer should understand that that guy, there's just no way he's going to be able to get up off the ground and charge fast enough for somebody to stop him. He could, but until and unless he presents that type of immediate threat, deadly force is not authorized, Your Honor. I guess the question is, how do we decide, why do we decide in this case that he didn't present that threat, that he clearly didn't present that threat, when it does seem to me from the evidence that although he was down, again down, and clearly had been shot, he was trying to get up. Because, Judge, and to address an issue you brought up earlier, there is evidence in the record that the dispatch broadcast that this individual, who's got no shirt on at 5.30 in the morning in 40 plus, 50 degree weather, was out of it and was talking but made no sense. So I appreciate the officers don't know exactly what's going on with him, but there is some evidence in the record that he's mentally unstable. And the case law would say, Lopez... Let me ask you this, because I don't think I have a clear picture of this from the record. What is the evidence in the record that McKee himself was aware of that aspect? He's hearing all the radio transmissions, Your Honor, all the officers are. It's being broadcast out to all of them. The 911 call is? No, the dispatch that's reporting the 911 call to the officers who are responding says that, and that is in the record. But Racinski, Chappell, Rhodes, Lopez, all these cases addressing people with knives all indicate, and the lower court's decision is predicated for at least the use of force by friends when this individual is basically hiding behind this large fenced-in enclosure, is that until and unless that person with a knife moves toward the officer, makes some type of threatening gesture, gets within proximity where he poses that type of immediate threat, deadly force is not authorized. So when he turns, after having run, and he turns on McKee, has his knife pointed toward him, that doesn't present a threat when he's 10 to 15 feet away? Judge, the record does not suggest he ever turned towards. Yes, it does. Now, come on. McKee says that. No, McKee says when he comes through this breezeway, Jason White is standing still. All right, well, he had his back to him before, and now if he's facing him, he had to turn. He stopped running. I agree, Your Honor, he stopped running. He stopped running, but his back wasn't to McKee anymore. He ran through the breezeway. McKee lost sight of him. When McKee breaches the breezeway, he sees Jason White just standing there with a knife in his hand, and McKee slows down and has him at gunpoint. He makes no movements for McKee's second use of force. He makes no movements. So now this lower court has said it's reasonable to shoot a man with a knife from 15 feet away who's not moving, making any threats at all, and that is at odds with the case law that this circuit has set forth. Drop the knife. Correct. As the other cases in this circuit court have held, people refuse to drop the knife. The difficulty here, obviously, is it was a concerning situation, and you had a call that was concerning. But to me, I think the issue that's been brought up by your opposing counsel is how do you handle the three exercises of deadly force by Officer McKee? The lower court agreed that the first use of deadly force was— he gave McKee qualified immunity for that, the very first use, and that was after the flight from Friends and because of the knowledge of the earlier felonies. He also granted qualified immunity to the officer for the second use of deadly force, where White was running. My concern is the third use of deadly force because that was the use that the district court said you do not get qualified immunity for, and that's the use where White has been shot in the shoulder, shot in the back, I believe, by McKee with the other approved use of force, and now McKee is standing 10 to 15 feet away. White has fallen on the ground. He is moving, and he says he can see that the knife has not been dropped. Officers are around him. My question to you is in that circumstance, what is your best case that supports the district court's decision that that was not a use of deadly force for which qualified immunity was appropriate? I think the Lopez v. City of Cleveland case sets forth the general proposition that a suspect who is not moving towards or in close proximity of an officer doesn't present an imminent threat. But there's at least a question, a fact that needs to go to a jury, whether that presents an immediate threat. I do want to address Frenz's use of force because I don't think we've discussed that, and this is a situation where there are a number of erroneous factual findings by the lower court. The lower court found that that fence, this is where Jason White is cowering, hiding behind this fenced-in enclosure, and the position, the court notes in footnote 6, that Frenz's position is unclear. Frenz's position relative to Jason White is critical to evaluate whether it's a reasonable shoot. There's a fence in between him. Frenz admits he uses the fence as cover. He's moving this way, getting more cover. The lower court found that Frenz was east of the fence through the opening, and the diagrams that we submitted in the testimony don't support that. Frenz's own diagrams weeks afterward. I would say there's a genuine issue of material fact here. Absolutely, Judge, and let me set forth a couple additional. The lower court found that that fence was 2 feet tall, and in fact it's 5 feet tall, 4 to 5 feet tall. There's no photo there of a man standing by it. It's not 5 feet tall. Judge, the defendants have conceded it's 4 to 5 feet tall in their brief, okay? And they say that he's 6 to 8 feet away in a straight line. Well, Jason White can't get through that fence. He can't step over it, as the lower court indicated. So to go around it, Judge, we're talking about 20-plus feet. Twenty-plus feet, he turns to the left to run away, and that's when he's shot. Sergeant Frenz testified, Your Honor. Sergeant Frenz testified that he does not and cannot know if Jason White was coming at him, and the lower court's opinion is entirely predicated on a finding that there's no dispute that Jason White was coming at Sergeant Frenz, and there is a dispute in the record as to whether he was coming at him. He could retreat. There was room. This case is much like Lopez where a man with a machete, there's a question of fact whether he turns toward his sister or he doesn't. His sister's in very close proximity to him, and this court found in Lopez that that's an issue of fact the jury needs to determine. If he's turning towards the sister, it's reasonable as a matter of law. If he is not moving toward his sister, shooting him is potentially unreasonable. We have that same issue in this case with Frenz, and I would invite the court to review the briefs and the exhibits very carefully because the positions of these two individuals is disputed. The movements immediately before the shooting are disputed, and under plaintiff's facts, Sergeant Frenz has substantial cover, room to retreat. He has a wooden fence four to five feet tall, Your Honor. Before your time's up, would you address the Monell claim and why we would have jurisdiction to hear that? Judge, I do not believe there's jurisdiction to hear the Monell claims. And why? Right, because first of all, the lower court didn't address the Monell claims on the first three uses of force, Frenz's use and the first two by McKee, because it found no underlying constitutional violation. We submit there is an underlying constitutional violation, and at that point there's no jurisdiction to hear the Monell claim, and that should be sent back to the court for further proceedings. With respect to the Monell claim that does exist, that did survive summary judgment, it's not an immediately appealable final order. The lower court did not certify it as a final appealable order, and so there is no jurisdiction to hear that as well. That's a jury issue. That goes to the jury. I want to address McKee's first use of force quickly, and the law has been clearly established that regardless of the previous felony committed, this is in the Alex Littlejohn v. City of Cleveland case, a recent case, regardless of the previous felonies committed, an individual who is running away from the police has a clearly established constitutional right not to be shot in the back until and unless he presents an imminent threat of death or serious physical injury. The lower court found that he presented no threat to McKee at the time McKee shot him in the back,  So how then can this court say it's reasonable as a matter of law that Jason White posed an immediate threat to people who are not in his vicinity? My time is up. Unless there's any other questions, I'll be back for my three minutes. Thank you. Jason White was not hiding or cowering behind the fence. Sergeant Frenz fired his shots in response to a quick and sudden movement to the eastern opening of the enclosed area, which is exactly where he needed to go if he was going to attack Frenz with a knife. Defendants have not conceded that the fence was five feet tall. The defendants have conceded that the fence is four feet tall. It is four feet tall. The height of the fence doesn't matter, except to the extent that it was short enough that Frenz could see what White was doing, what White was doing with his knife, and where White was going. The fact that plaintiffs have speculated that White's intent was actually to flee, based on what he did after the shooting, is first speculation in that, like during the confirmation with Alderman, it's just as likely that McKee abandoned his attack on Frenz after he was shot. But second, his subjective intent, White's subjective intent, doesn't matter. The quick and sudden movement to the eastern opening of the fence while brandishing a knife would, to a reasonable officer, be perceived as a potential threat, as a reasonably perceived threat of deadly force. As far as jumping around a bit and going to McKee's third use... Yes. He didn't look at the intent. He even said, in my memory, he could have been fleeing out of there, but what we have to ask is what the officer envisioned. And I think the critical failure in plaintiff's argument here is this notion that there can't be a threat of force from a knife-wielding assailant if the knife-wielding assailant can't move straight. Contrary, there's nothing in the record, and thank you for bringing me back to the point. At the time of the shooting, the record evidence is not disputed that Frenz and White were 6 to 8 feet apart through the fence. This is which? Frenz, I'm sorry, it's Frenz shooting, his only shooting. Frenz shooting for which he was granted qualified. Yes. Frenz and White were 6 feet apart, 6 to 8 feet apart through the fence. The fence added only about 4 feet. We have that in the record. There is no 20 feet. There is no 15 feet. It's 10 to 12. It added an extra two steps. It doesn't eliminate the threat. And as far as an easily navigable obstacle, there's no case law that says an easily navigable obstacle eliminates any reasonable perception of threat. In fact, to the contrary, Chappell specifically rejects that notion. True, in Chappell it was a mattress that could easily be stepped over, but here it's a fence that can easily be gone around. What do you have to say on jurisdiction for the Monell claim? The jurisdiction for the Monell claim, even without the cross appeal, is based on the fact that both the Monell claim and both McKee's third use of force liability requires an underlying constitutional violation. An underlying constitutional violation is a prerequisite for both. So to the extent this court If the third use of deadly force is an underlying constitutional violation, what happens to the Monell claim? Without the Monell claim, this court wouldn't have jurisdiction to further consider the training. With the cross appeal, which is based on 54B certification, we have every issue before this court except the second half of the Monell claim, which discussed the substantive merit. Below, the defendants didn't oppose plaintiff's request for 54B certification so long as the whole issue would come before the court. The court acknowledged that request, but then certified only the plaintiff's issues. But it seems eminently unfair, and the doctor-dependent jurisdiction would almost be turned on its head if everything is appealable to this court now except that half sliver of the final Monell claim on the third use of force. As far as McKee's third use of force, the very last use of force, that I know they're hard to keep up with, Jason White wasn't trying to get up. He was getting up. And prior use, prior conduct, has been the theme admitted to by plaintiff by plaintiff's experts. Prior conduct, prior bad acts, prior violent behavior is indicative of future behavior. That's the distinction in Lopez. That's the distinction in almost every case cited by plaintiff. The threat created by Jason White at large in a large residential complex with a knife where he'd already attacked two officers, he'd already gone into somebody else's apartment with that knife, prior bad acts indicate a willingness for prior future violence. That is the threat. There's nothing in the case law that says the officers need to see Jason be within striking distance of another human being to see him. Does your argument depend upon your allegation that factually he attacked two officers? Factually, it's undisputed that he did. Now we're playing the word. Factually, it's undisputed that he did, but I think we're playing a word game on what constitutes an attack, whether we call it an attack, whether we call it an attempted yet unsuccessful attack. What we have is two incidents where Jason White's confronted by uniformed officers, results in a confrontation where there's a use of deadly force by the officers. Law enforcement officers are allowed to assume and should assume that their other officers behave reasonably. What we know then is we have two prior situations known to Friends, known to McKee, where Jason White has at least demonstrated a willingness to use his knife in a violent manner to avoid escape. We will look at the record on that. Thank you. A couple quick points before I do want to revisit Friends' use of force. With respect to Jason White's position on the ground for the final lethal shot to the chest that killed this young man, Officer Croc was present. He had his gun trained on Jason while Jason was standing up. His testimony is he saw Jason fall down, which we know was in response to McKee's second use of force, and he's testified under oath that he never saw Jason try to get back up. He said he didn't see him. What's that prove? It's evidence in the record from which a jury... But it didn't happen. But it's evidence in the record from which a jury conclude that he wasn't trying to get up. You have an officer with his gun trained on a suspect who says he didn't see him try to get up. So I would suggest that's an issue of fact. Croc, K-R-A-C-H-T, Officer Croc. With respect to whether or not Jason White attacked anyone, this record is full of factual disputes on whether or not he ever attacked anyone. The officers have testified they never witnessed Jason attack anyone. And back to Sergeant Friends, which I think is the most critical, because I do think that once the court really studies the cases, shooting him in the back while he's 25 feet away and nobody's in his vicinity is unreasonable. Shooting him while he's just standing still, making no threatening movements, is not permitted under this court's case law. But Sergeant Friends' shooting, there's just too many disputed issues of fact as to whether he posed an imminent threat. This fence enclosure is substantial. It's significant. Sergeant Friends is using it as cover. While they're six to eight feet away, draw a triangle that goes outside the fence, around the front of the fence, through two cars to get to Sergeant Friends. That's much longer than adding two feet. I don't know how you could... The geometry just doesn't stack up that that's only two more feet. And so there's evidence in this record, as there was in Lopez, that the suspect is turning away from Sergeant Friends, not toward him. Sergeant Friends is near the middle of this fence, and he's using it as cover. And when Jason turns to his left to go out of the entrance, a jury could find that that suspect is turning away from the officer. And if you believe Sergeant Friends, any movement that he makes warrants him to be shot dead. And the case law doesn't permit that, because what Sergeant Friends' argument is, is I don't need to wait to see if he's going to come at me. If he makes any movement at all, he could. I understand the situation these officers are in, and we all do, but just because an officer is fearful in any situation, has every right to be fearful, does not lower the requirements of the Fourth Amendment. Jason White was entitled not to be shot dead until he moved toward Sergeant Friends in a threatening manner. And there's evidence in this record that he did not do so. Thank you. Thank you, counsel. The case will be submitted. Clerk may call the next case.